I've been advised by the clerk that council is present and ready in all of the four argued cases. So I'm going to dispense with reading the calendar this morning. I think we're ready to proceed with the first case. Local 817 v. XPO Logistics. May it please the court. I'm Joseph Daly for the Pension Fund Appellants. I'm going to try to reserve two minutes for rebuttal. Your honors, at the heart of this securities fraud case lies a very simple story. Among the defendant, XPO Logistics, 50,000 customers, one stood head and shoulders above the rest. Amazon. Amazon alone represented 52% of XPO's revenue growth coming into the class period. It took the other 50,000 customers together to produce the remaining 48%. And of XPO's 50,000 customers, just five of them accounted for fully 11% of XPO's revenues. And of the five, Amazon alone was responsible for nearly half of that 11% chunk. Now, so when the news broke in early February that Amazon was going to launch its own delivery service, the market punished other big delivery services like FedEx and UPS. But XPO escaped that fate because of two things. Number one, the investors did not know that Amazon was XPO's most important customer. And second, defendants cemented that lack of knowledge with class period misstatements and omissions. For example, two days after the Amazon news broke, XPO filed its annual report for 2017 in which it deleted a specific percentage reference to its largest unnamed customer's revenue. And that was Amazon. Instead, XPO claimed to have, quote, a diversified customer base that minimizes our concentration risk. In that same SEC filing, XPO said that its increased revenues were being primarily driven by growth in Europe and North America. But again, omitted that Amazon alone was the single customer responsible for over half of that growth. Fast forward a few months into May of 18. Can I ask a question just about the two statements you just described in the annual report? Yes, Your Honor. Was there an affirmative duty to disclose at that time that, oh, by the way, Amazon, who you just announced that they're bringing their insourcing, is our biggest customer? Was there some affirmative duty? And where did that come from? At least two places, Your Honor. Number one, having addressed the subject of growth and knowing that the market was paying attention to what Amazon's announcement had meant for XPO's peers, XPO had a duty at that point to speak fully about the reasons for that revenue growth coming into 2018. And the second duty comes underneath item 303, where trends and uncertainties need to have been disclosed. And of course, Amazon announcing that it was pulling back so much of its business from the big delivery services, certainly that represented a negative trend in uncertainty going forward. Can I just ask, I mean, I see, isn't there some internal tension in the timing of your narrative? I mean, you argue that Amazon drove XPO's growth in 2017 and the first quarter of 2018. I'm just trying to make sure I understand your argument. And the complaint alleges that Amazon's business accounted for $900 million in revenue in 2018 overall? Over the full year, yes. So the theory has to be that there was big growth in the first quarter. And you say then fall off in the second, third, fourth quarters that triggered a duty to reveal to the market. I mean, Amazon, I mean, the defendants themselves say that they acknowledge that there was, Amazon's pullout had financial effects in December and January. They just say it's abrupt. And so you're saying it occurred. But they didn't acknowledge it at the time, Your Honor. No, right. All the way up through 2018, in fact. The corrective disclosure. Sure, sure. In third quarter. And as we know, I'm going to back up just a second. We know from a whole series of confidential former employees, as well as an Amazon area manager, that by May of 2018, Amazon's pullback was being felt within XPO. All right. XPO was shutting down some 2.8 million square feet of warehouse space just in the U.S. All right. And in the third quarter, the success story, XPO suddenly missed the quarter. And what did they do? The defendants blamed it on the bankruptcy of a little client over in England, House of Fraser, which even the analysts at the time were skeptical of. And then in fourth quarter 2018, they missed the numbers again. And again, the analysts said, now hang on. XPO all along has said it's well diversified. It doesn't depend upon any single customer. And this is the second quarter in a row in which you've blamed a particular customer for not making your numbers. And of course, at that time, XPO still did not admit that it was Amazon, although some of the analysts picked up on that and said parenthetically that it probably was Amazon. Well, didn't the market know at this point that Amazon was moving to take over for itself delivery services that it had outsourced? Yes. In fact, they knew, the market knew back in February. It's very easy to connect those dots. Well, but we don't have that connection, do we here? I mean, we don't have any evidence in the record that the defendants themselves told their investors, hey, Amazon is waiting in the wings. Amazon is our largest customer. We do know that the market... Excuse me for interrupting. What portion of their revenue, putting aside revenue growth, did Amazon account for? For 2018, it was a 10 percent growth. I'm sorry. I'm sorry. I misspoke. Revenues, approximately half of that. And coming into 2019, the defendants conceded that their top five customers, of which Amazon obviously was the top, was producing 11 percent of revenue. And they admitted that... And that for the portion of that, the defendants admitted at the end of the class period was between 4 and 5 percent. So nearly half. All right. So we have a constant nearly half of revenue from... Four percent. Five percent. That's half of what? Half of XBO's overall... I'm sorry. Half of the 11 percent attributed just to five customers out of 50,000. So obviously those top five customers of XBO, very material to the company, very material to the investors. And the fact that investors did not know that that quintet was about to become, or had become, sorry, a quartet throughout 2018 was very, very material to the investors. So going back to the middle of the year, May 2018, we know Amazon's pulling back. And yet the defendants again claimed this healthy diversification. And in that same quarterly filing, they claimed there had been, quote, no material changes to risk factors previously disclosed. And yet at the end of the class period, we've got the defendants, CEO Jacobs, admitting that our largest customer pulled back its business. And we knew, quote, that business wasn't going to stay because of that particular business stated business plans. And in May of 2019, Jacobs... It's a post-class period statement, but under this court's precedence, we can look at that. In May of 2019, Jacobs concedes that the customer concentration within XBO had been, quote, too much. And that going forward, XBO was going to become more diversified. Well, that's a wonderful sentiment, but that's the very same sentiment that the defendants had uttered a year earlier, knowing that Amazon had just pulled back its business, but that investors were not aware of. Are there standards, kind of, I don't know, in cases or other places that we can look at to determine when something is demonstrably not well diversified? In other words, you've got a company where Amazon is 5% of their gross revenues. They've got 50,000 customers. Their top five comprise 11% of the revenues. How do we know whether that's within the range of what somebody could plausibly describe as well diversified? And I'm not aware of any precedents that address that exact issue, Your Honor, but I would say here that seems to me to be a question that a reasonable shareholder would want to be asked, that a reasonable fact finder would want to opine on. And we don't have that here because we're only at the pleading stage. I'd like to reserve the remainder of my time, please. May it please the Court. Julia Tarver Mason Wood from Paul Weiss, Rifkin, Wharton & Garrison on behalf of the defendants. Your Honor, the Court below, Chief Judge Underhill engaged and wrote a painstakingly and scrupulously detailed opinion in which he accepted as true all of the allegations set forth in the complaint and gave the plaintiffs, as the Court is aware, the opportunity to amend the complaint, 60 days to work on that amendment with detailed instructions about the deficiencies as the Court saw it at that time. Unfortunately, the plaintiffs failed to correct those deficiencies and that's why we're here today. The Court's opinion established four wholly independent bases to dismiss the complaint, any one of which would be enough for this Court to affirm dismissal of the complaint. As your Honors, I believe, may recognize, the crux of plaintiffs' theory here is illusory and self-contradictory, I would submit. They claim that the defendants should have warned that Amazon Business was slowing down at the very time the allegations of their own complaint demonstrate that Amazon Business grew in 2018, grew to a record high that it had never been before. Fundamentally, defendants ask, the plaintiffs ask, that defendants disclose the risk that one of their top customers might leave due to insourcing of their logistics business when that is precisely the explicit risk that XPO provided in its financial statements when it said that its profitability could be impacted by either current or prospective customers deciding to take their logistics business in-house. So what we're left here today is not an example of where the quintet turns into a quartet. Amazon was still playing the music throughout 2018. In fact, the music that Amazon was playing was louder than it had ever been before. So the whole theory of the complaint here falls on its own allegation that in 2018, Amazon spent more money at XPO than it had ever had. And respectfully, I would ask the Court to consider that any disclosure XPO had made about the possibility that Amazon might leave and then Amazon produces greater revenue to XPO in 2018, we would be back in front of the Court with a false disclosure in that regard. I'm thinking about this diversification thing. I think the theory is not just they should have made an announcement. Once you open your mouth and start talking, you've got to speak in complete sentences. And so in this case, they say repeatedly, we're well diversified. When it all comes home to roost, they say, we weren't really well diversified. And we know their allegations based on these internal sources that they were getting the data all along of the extent to which their reliance on Amazon was exposing them to risk because the market knew what Amazon was doing, but they didn't know the role that Amazon played in this country and in this company. Why isn't that incomplete disclosure or misleading by omission? Well, first of all, I think Your Honor took the point quite well, that there are no specific standards about what makes a company, quote, well diversified. That is precisely the sort of inactionable puffery that courts have held cannot form the basis for a 10B5 claim. I think here what you're talking about is Amazon was the largest customer, but it was the largest customer of 50,000 customers. This is a global business with over $17 billion in revenue. And in one year, the highest year, Amazon was $900 million of that $17 billion in revenue. So there are standards that the court and the SEC look to. For example, if you have 10% or more of a company's business, that should be disclosed. Amazon never came close to reaching the 10% threshold. And therefore, there was no independent duty to disclose Amazon as a top customer of SBO. Furthermore, I think if you look to the chronology of what happened here, XBO did disclose at the very moment that XBO became aware. While there are allegations in the complaint that lower level employees became aware of trucks being fewer at one warehouse or a few warehouses out of 800 warehouses nationwide, there's no allegation in the complaint that any kind of pullback from Amazon reached the top executives at XBO or that the pullback was precipitous. Is it reasonable to infer that the top executives at XBO would be very attentive to what was happening at Amazon given Amazon's statement of its business intentions? I think that is reasonable to infer, Your Honor, but I think the facts show that again in 2018, the Amazon business continued to grow. So to make a disclosure that the Amazon business is not growing when in fact it was, would have been its own violation. I think what you have here is a situation where Amazon had made a very public announcement, as Your Honor noted, Judge Parker, and that announcement was followed by everyone in the industry. But the facts on the ground was that Amazon was continuing to offer more and more business to XBO throughout 2018 and that abruptly, as the defendants disclosed in the fourth quarter in December 2018 and January 2019, the pullback became more extreme, and at that time they made the disclosure. Maybe I'm misunderstanding the allegations. I'm thinking about this tonnage conversation, and that was in the second quarter. And there's questions about gee, your tonnage is dropping. And the allegation, at least as I understand it, is they knew from their own internal data that the tonnage was dropping because Amazon was beginning to pull back. But the answer to the question was, well, this is, we're not really looking for tonnage. We're looking for quality, not quantity on the tonnage. Isn't that an omission when they have, the allegation is they had the data that told them exactly why the tonnage was dropping and they didn't disclose that? Well, again, Your Honor, I would say that with respect to the second quarter tonnage, there is no allegation of how, if at all, Amazon tonnage was declining. In fact, there are no properly pled allegations that Amazon was even a large LTL, less than truckload, customer of XBO. The former employee reports that are cited, and each of which are addressed on page 22 of our opposition brief, are extremely vague, both as to time as well as to financial impact. How much was the Amazon tonnage declining in the second quarter? Did that, if at all, and did that tonnage decline, if at all, contribute in a material way to the revenues of that business? We simply don't have those allegations in this complaint, despite an opportunity to amend to add them. In fact, we have a contradiction within the complaint, because in one area they reference unspecified, undated tonnage reports without identifying who wrote the reports, who received the reports, and then elsewhere in the same complaint, at paragraph 61, note 24, they admit that the tonnage reports were not, in fact, customer specific. And so be very careful, I would urge your honors, when reading the complaint, because they're a little bit loose with their quotations, and where they may talk about a given report as showing Amazon's decline, what you'll see is that the report actually talks about tonnage declines which they, plaintiffs, attribute to Amazon without a well-founded basis that Amazon was, in fact, the reason for the tonnage decline. Could you briefly address the claim that there was a failure to disclose a known uncertainty under item 303? And in particular, given, you know, after the class period, we have the CEO looking back and saying we should have done more to diversify, we thought it would not happen as abruptly as it did, and at the start of the period, we have this Wall Street Journal disclosure. Again, your honor, I would refer, as Chief Judge Underhill did, on pages 40 to 41 of his opinion, to the fact that XBO did, in fact, disclose that as a material risk. XBO disclosed that any current or prospective customer who took their logistics business in-house, which is precisely the announcement that Amazon made, could represent a material risk to XBO's future profitability. So the very risk that plaintiffs asked to have been disclosed was disclosed. Now, did they use the word Amazon in that disclosure? No, because again, at the time, Amazon was continuing to supply more and more business to XBO, and I would argue that it would have been inappropriate to include Amazon by name at that point, given that Amazon was its top customer and was contributing more in a record year that year than it had ever done before. So the disclosure was made, the risk was made known, and I don't believe there was any oversight in that regard. There are no further questions. Thank you, your honor. Thank you. We'll hear rebuttal. Three quick points on rebuttal, your honors. Number one, Amazon was playing the music throughout the class period. Well, if they were, they were hitting some sour notes. That Amazon manager recalls that of the five warehouses where he used to see 400 XBO trucks every day, suddenly there were, quote, none. So what do we demand from that? That's anecdotal evidence from a low-level employee? He's not low-level at all. He's an area manager. He's responsible for five warehouses at which 400 Well, I don't think this court in the NOVAC decision, for example, required that anybody giving evidence that helped form the allegations in that case had to be at the executive suite level. It said as long as the people It's anecdotal evidence from which we are asked to extrapolate trends across a multi-billion dollar company. Your honor, anecdotal evidence, actually anecdotal allegations, facts that must be accepted as true at this stage. That Amazon manager can be tested later. Well, we don't require pure evidence at the pleading stage, your honor. No, that's fine. Second point, counsel mentioned or asserted that the top weekly meetings at which customers won or lost would be discussed along with key financial metrics. Throughout the class period, CEO Jacobs is speaking to the market. He's signing those 10 cues in which they said there were no material changes to the risk factors. If he didn't know, then he was reckless in making those statements. And the third point, the district court supposedly accepted all of our allegations as true. That's not true. At every turn, the district court challenged the pleaded numbers and engaged in defendant friendly inferences and demanded granular evidence of Amazon's effect at XPO, wanted to see an actual document explaining to the executives at XPO that Amazon was leaving when in fact Amazon announced it for the world. If your honors have no further questions, thank you.